WILLIAM NASH, APPELLANT, v. NELSON A. BAKER ET AL., APPELLEES.

FILED OCTOBER 4, 1893.  NO. 5147.

Railroads: MUNICIPAL CORPORATIONS: PROPOSITION TO VOTE BONDS IN AID OF CONSTRUCTION: FRAUDULENT REPRESENTATIONS OF DONEE: RESTRAINING ISSUANCE OF BONDS. A proposition to vote bonds in aid of the construction of a rail-

road, when accepted, is in the nature of a contract, and if the electors, through false or fraudulent representations of the officers of the donee, have been induced to vote such aid, a court of equity in a proper case will relieve as against such bonds.

APPEAL from the district court of Buffalo county. Heard below before HAMER, J.

The facts are stated in the opinion.

*Greene & Hostetler, R. A. Moore,* and *J. B. Strode,* for appellant:

The false and fraudulent representations made by the officers and agents of the defendant company as to the character of the road for which the bonds were sought to be voted were made for the purpose of deceiving the electors, thereby inducing them to vote in favor of the bond proposition. Equity will lend its aid to relieve the people under such circumstances. The finding and judgment of the lower court were therefore wrong and should be reversed and the injunction made perpetual. (*Wakefield Case,* 2 O'Mal. & H. [Eng.], 102; *Taunton's Case,* 21 Law Times Rep., n. s. [Eng.], 169; *Boston Case,* 2 O'Mal. & H. [Eng.], 161; *Brassard v. Langevin,* 1 Sup. Ct. Can., 145; 6 Am. & Eng. Ency. Law, p. 371, sec. 7; Cooley, Torts, 501; *Haldeman v. Chambers,* 19 Tex., 50; *Henderson v. San Antonio R. Co.,* 67 Am. Dec. [Tex.], 675; *Wullenwaber v. Dunigan,* 30 Neb., 877; *Sinnett v. Moles,* 38 Ia., 25; *Wickham v. Grant,* 28 Kan., 517; *Curry v. Board of Supervisors of Decatur County,* 15 N.W. Rep. [Ia.], 602; *Melendy v. Keen,* 89 Ill., 395; *Sanford v. Handy,* 23 Wend. [N. Y.], 260; *Burhop v. City of Milwaukee,* 18 Wis., 453; *McClellan v. Scott,* 24 Id., 81; *Davis v. Dumont,* 37 Ia., 47; *Crump v. United States Mining Co.,* 56 Am. Dec. [Va.], 116.)

*Sinclair & Brown* and *Calkins & Pratt, contra,* cited: 2 Pomeroy, Eq. Jur., sec. 894; *Runge v. Brown,* 23 Neb.,

822; Wharton, Evidence, secs. 328, 340; *Brown v. Piper*, 91 U. S., 37; Taylor, Evidence, sec. 4, note 2; Best, Evidence, secs. 253, 254; *Gibson v. Stevens*, 8 How. [U. S.], 384; Cooley, Torts, p. 476; *Mooney v. Miller*, 102 Mass., 217; *Starr v. Bennett*, 5 Hill [N. Y.], 303; *Williams v. Spurr*, 24 Mich., 335; *Mitchell v. McDougall*, 62 Ill., 498.

RYAN, C.

This action was begun in the district court of Buffalo county, Nebraska, by William A. Nash, for himself and on behalf of the taxpayers of the city of Kearney, against the mayor and members of the city council of said city, and the Kearney & Black Hills Railway Company, to enjoin the collection of $75,000 in bonds voted by the city of Kearney in aid of the construction of said railroad. The petition, or rather the amended petition, upon which the case was tried, was very lengthy, alleging, as it did, many irregularities in the manner of submitting the proposition for voting bonds to the Kearney & Black Hills Railway Company, and setting forth other irregularities as to the manner in which the votes were cast and the result ascertained and announced. The chief paragraph however, and the one to which we have devoted special attention, reads as follows:

"7. That the Kearney & Black Hills Railway Company, by its officers and agents, procured the votes at said pretended election to be cast in favor of said bonds by false and fraudulent representations made to the electors of said city concerning the said Kearney & Black Hills Railway Company, in this; that said railway company, by its officers and agents, represented and pretended to the electors, for the purpose of procuring their votes for said proposition, that the said railway was an independent line of road, and a competing line with all other roads, and had no connection with any other line of railroad in its management, operation, or organization, and would be so run and operated.

Plaintiff alleges the truth to be that the said Kearney & Black Hills railway was not an independent line of road, and was not a competing line of railroad and was not so intended to be, which all of said officers and agents then and there well knew, but that said Kearney & Black Hills Railway Company had at said time a freight traffic contract with the Union Pacific Railway Company by which all freight shipped over said Kearney & Black Hills railroad was and is but a feeder to the Union Pacific railroad, and was so known to be by said officers and agents at the time they made such fraudulent and false representations aforesaid, and was and is under the control and domination of the Union Pacific Railway Company."

The prayer of the amended petition was, that a temporary order of injunction might be granted restraining the said authorities designated from authorizing the issuance of said bonds and donating the same, or any part thereof, to the Kearney & Black Hills Railway Company, or to any person in its behalf or for its use and benefit, and restraining the Kearney & Black Hills Railway Company from taking or receiving the said bonds or any part thereof from the officers of said city, or from attempting to or negotiating and disposing of said bonds and procuring the same to be registered, or from in any way interfering or meddling until the further order of the court, and that upon the final hearing said injunction might be made perpetual, and for such other and further relief as was just and equitable.

Issue was duly joined upon the averments of the amended petition, and a trial thereof was had, and decree rendered in favor of the defendants on the 15th day of July, 1891. In this decree is the following finding, to-wit:

"The court further finds that while the officers and agents of the Kearney & Black Hills Railway Company represented to the voters of the city of Kearney that said line of road would be an independent line of road, and that great benefits were likely to accrue to the city of

Kearney on account thereof, yet the road was only to be built a distance of 67 miles and to terminate at the city of Kearney, near the center of the continent and distant 700 miles from a practicable waterway; that its only method of reaching the coast was over the line of the Union Pacific, or Burlington & Missouri River railway, both of which railway lines run through the city of Kearney; that these facts were common knowledge to all persons in the city of Kearney of ordinary intelligence, and the representations should have deceived no one, and were allowable under the rule of law which excludes actual deception but permits puffing and exaggeration of language in the encouragement of trade."

As we regard this finding of the court as not at all satisfactory as to the averments set out in paragraph 7, we shall examine *de novo* the issues specially presented by that paragraph, taken in connection with the averments of the amended petition.

John H. Hamilton, vice-president of the Kearney & Black Hills Railway Company, testified that a night or two before the date of the election, February 13, 1890, E. C. Davidson, president of the above railroad company, made a speech at Durley's hall at Kearney, in which he urged that the bonds be voted as proposed, and said that the Union Pacific Railway Company did not own a dollar of the stock of the Kearney & Black Hills Railway Company; that the Union Pacific was to receive and be paid $205,000 in bonds by the Kearney & Black Hills Railway Company for the right of way and grade up the Wood river valley; that to his knowledge no director or stockholder of the Kearney & Black Hills company was in any way either directly or indirectly connected with the Union Pacific railroad. Mr. Hamilton testified further, that before the election he had stated to the people that the Kearney & Black Hills railroad was not controlled by the Union Pacific Railway Company; that the Kearney & Black Hills

railroad would be built by a company which was not under the control of the Union Pacific; that it would be controlled by people in Nebraska; and that it would be operated by a traffic agreement with the Union Pacific. He further testified that the board of trade of Kearney appointed a committee to ascertain what the Kearney & Black Hills Railroad Company proposed as to building a line of road; that he told said committee that the last named company would be independent of the Union Pacific Company, but would be operated under a traffic agreement with the Union Pacific; and that witness had interested some of his friends, and got them to organize a company to buy that line, and operate it under a traffic agreement with the Union Pacific.

W. C. Holden testified that at the public meeting held at Durley's Hall, just before the bonds were voted, Mr. Davidson, the president of the Kearney & Black Hills Railroad Company, had said that the latter company had a traffic agreement by which all unconsigned freight would be turned over to the Union Pacific at Kearney, and that Mr. Cameron, and possibly Mr. Holcomb, of the Union Pacific, held stock in the Kearney & Black Hills Railroad Company,—witness thought to the amount of $100,000; never heard that it held one-half of said stock. It was insisted by the opposition to the bonds, that the Union Pacific Company was interested in the Kearney & Black Hills Company, and was to hold a controlling interest in the road. This was denied by the other party, who claimed it was not a Union Pacific road.

E. C. Davidson, the president of the Kearney & Black Hills Railway Company, testified that he made a speech to the people of Kearney two nights before the election, at Durley's Hall. About one hundred people were present. That he stated to these people that he and his associates in the Kearney & Black Hills Railroad Company had an option that permitted them to buy the right of way and

grade to Milldale, and that if the bonds were carried it should be bought and the road completed. At that public meeting Mr. Greene had asked this witness as to the proposed railroad being independent or distinct from the Union Pacific, and that witness had answered that neither the Union Pacific road nor any stockholder in the Union Pacific road, had any stock in the Kearney & Black Hills road. The original contract was that the road-bed should be paid for by first mortgage bonds, but after the Kearney & Black Hills Railroad Company got into position to deal, the last named company appointed Mr. Hamilton to negotiate, and he made what was considered a better contract, by the terms of which payment was made in stock instead of bonds. The Union Pacific owned the whole road at the time of the election and had given the other railroad company an option to purchase, but owned no stock in the Kearney & Black Hills road. Mr. Davidson further testified that at the public meeting referred to, one of the prominent questions discussed was whether the Kearney & Black Hills railroad was to be an independent road, or whether it was to be under the domination of the Union Pacific Railroad Company, the opponents of the bonds claiming that it would be dominated by the Union Pacific.

Thomas H. Cornett testified that in the canvass for the bonds it was urged in opposition to voting them that the road proposed to be aided was simply a Union Pacific "stub," and a scheme of the Union Pacific to secure the bonds to be voted. The friends of the proposition scouted that idea all through the campaign, denied it, and claimed that if the road was built and operated the Union Pacific would not have anything to do with it so far as its ownership or control was concerned. Witness attended only one meeting, but at that it was stated that the headquarters of the proposed road would be at Kearney. In a general way the opponents of the bonds claimed it was a ruse of the Union Pacific, and that the Union Pacific was

to dominate the thing, and that it was a part of the Union Pacific system.    The friends of the bonds claimed that was not so.

B. H. Goulding testified that the opponents of the bonds undertook to fight them down with the idea, or with those statements, that it was a Union Pacific "stub."    Witness had one or two talks with different parties and the company,—one with Mr. Davidson, and once or twice talked with Mr. Hamilton,—and never understood that it was a "stub" road, but understood it was an independent company that had a good traffic arrangement.    That was one of the things witness inquired about.

Gen. A. H. O'Connor, whom the evidence shows to have been very active and efficient in urging that the bonds should be voted, testified that in his speeches he did not claim it would be a competing line, for he knew if it came into Kearney with no way to get out it could not be competing; that he said in urging people to vote the bonds he did not believe it was a Union Pacific railroad, and he' did not believe it was; that he was frank in that.

The above quoted evidence was given by witnesses sworn on behalf of the defendants on the trial in the district court.  For the plaintiff in that court the testimony of F. J. Switz, Henry S. Harding, Lyman Brigham, J. C. Bes- .wick, James O'Kane, A. H. Bolton, H. H. Seeley, P. D. Henderson, B. G. Henderson, J. E. Shipman, M. V. Esler, C. F. Yost, J. W. Worsley, F. Y. Robertson, and Lewis Robertson was even more pointed as to the representations being that the proposed line of road would, when built, be entirely independent of the Union Pacific Railway Company, than was the evidence of the defendants' witnesses. These last named witnesses further testified to the generally favorable effect of the assertions of the Kearney & Black Hills Railroad Company's independence of the Union Pacific Railway Company in respect to the bond proposition, and at least three of these witnesses directly

testified that this asserted independence induced them respectively to abandon opposition to, and vote for, the bonds. It, therefore, must be accepted as without question, first, that a great deal of opposition to voting the bonds existed, founded upon a suspicion that the Kearney & Black Hills railroad when built would be under the control of the Union Pacific Railway Company, and, second, that the direct assurances of the officers and duly accredited agents of the Kearney & Black Hills Railroad Company, by denials of the dependence of the said company upon the Union Pacific Railway Company, in a large measure overcame existing opposition to voting the bonds as proposed.

It now becomes material to consider what relations were sustained or in contemplation between the Union Pacific Railway Company and the Kearney & Black Hills Railway Company at the time the bonds were voted. The ordinance under which the proposition to vote the bonds was submitted required that active work should commence in the construction of the proposed railroad within thirty days from the election adopting the proposition, and from the time its adoption should be duly declared. Within that space of time a written contract was entered into on March 14, 1890, between the Omaha & Republican Valley Railroad Company, the Kearney & Black Hills Railway Company, and the Union Pacific Railway Company. This agreement recited that the Republican Valley Railroad Company had acquired the right of way for a great part of a proposed line of railroad from Kearney to Milldale, and had expended large sums of money in unfinished construction of a railroad thereon, and that an agreement had been entered into between the two first above named companies for the sale by the first to the second named of the said right of way, and for the completion of said line of railroad by the second, and for the working of the said railway in connection with the railway of the Union Pacific Railway Company upon the terms in said agreement contained.

49

Following these recitals the agreement stipulated that the sale was by the first railroad named to the second named, of the unfinished line aforesaid between Kearney and a point about seven miles northwest of Callaway, being a distance of about seventy-two and eleven-hundıedths miles. The sum to be paid to the Omaha & Republican Valley Railroad Company was to be ascertained by estimates thereafter to be made by the chief engineer of the said Omaha & Republican Valley Railroad Company, and to be paid in the shares of the Kearney & Black Hills Railroad Company at their nominal value. The Kearney & Black Hills Railroad Company agreed with the Union Pacific Railway Company to transfer to the trustees mentioned in said written contract, and to issue to them one certificate for so many hundred dollar shares of the Kearney & Black Hills Railroad Company's stock as, together with the said shares transferred to the Omaha & Republican Valley Railroad Company, should equal in nominal value $12,000 for every mile, and a proportionate sum for every part of a mile, of the length of the partly graded location agreed to be sold, which was to be measured under the direction of said chief engineer, whose certificate as to said length should be final. The above transfers of stock were provided to be made contemporaneously; by which it may be unnecessary to remark, there would be vested in these two transferees stock to the nominal amount of $12,000 per mile of the road contemplated.

The agreement further provided that the Republican Valley Railroad Company should, for the period of fifty years, be entitled to name two members of the board of directors and the secretary of the Kearney & Black Hills Railroad Company. During that period no mortgage could be made for over $20,000 per mile, and the capital stock could not exceed $24,000 per mile, to be completed before the creation of such stock; and in case of an increase of stock, one-half of such increase should be thereupon

transferred to the trustees above referred to and therein-after named, and a certificate accordingly issued.

The agreement provided for the construction of the line of road contemplated upon certain conditions, which it is needless to quote, except to note that it was required to be of uniform gauge with that of the Union Pacific railway, and that for all purposes of traffic during the existence of the agreement, the Kearney & Black Hills railroad line was required to be worked as one line with the Union Pacific Railway Company's lines and the lines worked and controlled by the last named company.

The Kearney & Black Hills Railroad Company further agreed that it would never make any discrimination as regards rates or otherwise against the railway system of the Union Pacific Company; and it was agreed between them that the rates for all traffic carried between any places by the railways of the two last named companies should always be as low as the rates for carrying traffic between the same or competitive places by any other railway or railways in competition with the railway systems of said companies, and that all traffic secured by the Kearney & Black Hills Company to be carried to or by way of any place or places on the railway system of the Union Pacific Railway Company should, so far as the Kearney & Black Hills Company could lawfully determine the same, be carried by the railway system of the Union Pacific Railway Company, and for that purpose be delivered upon its railway system at some point of juncture of the two systems.

It was further provided that the Kearney & Black Hills Railway Company should always use its influence in favor of such traffic being so carried, and during the continuance of the agreement always work in close harmony and connection with the railway system of the Union Pacific Company, and would not at any time make any contract with any other railway company or line for connection or interchange of traffic, except at places on the northwesterly part

of its railway system, where its railway system does not con-
nect with the railway system of the Union Pacific Com-
pany; nor make or allow any lease or mortgage of its rail-
way system or any part thereof; nor create or suffer any
lien or incumbrance thereon; nor make any issue of stock
without the previous assent of the Union Pacific Company
expressed by resolution of its board of directors, except to
the extent previously provided.

The Union Pacific Railway Company on its part bound
itself to divert to the Kearney & Black Hills Company
such traffic as it lawfully might during the existence of the
agreement. It was further provided that the Kearney &
Black Hills Company, under such reasonable rules and reg-
ulations as the superintendent of the Union Pacific railway
should prescribe, might use for its passenger trains the pas-
senger station of the Union Pacific Railway Company at
Kearney, and have performed for it such usual service as
that use rendered necessary, at a price not exceeding $75
per month so long as the Kearney & Black Hills Company's
line should not in length exceed 100 miles.

It was also agreed that the gross receipts arising from
the traffic of both roads under the above provisions should
be apportioned between them according to the arrange-
ment that took effect on the 1st of January, 1889, for
division of joint earnings between the Union Pacific Com-
pany and the Omaha & Republican Valley Railroad Com-
pany. No evidence was introduced as to the terms of this
arrangement, nor was this subject of division in any place
in the record referred to, so that we are without any
data whereby to determine the ratio of division of the pro-
ceeds of the joint traffic between the two railroad compa-
nies under this agreement. It is probable that the traffic
agreement frequently spoken of at the meeting of the peo-
ple of Kearney antecedent to the vote upon the bonds, is
embraced in the latter part of the above described agree-
ment, and the arrangement between the Union Pacific

Railway Company and the Omaha & Republican Valley
Railroad Company, which took effect January 1, 1889, re-
ferred to in said agreement.

To a satisfactory understanding of the alleged traffic
agreement between the Union Pacific Railway Company
and the Kearney & Black Hills Railroad Company, the
arrangement which took effect January 1, 1889, is indis-
pensable. As we are without the means of ascertaining
the terms of the arrangement referred to, we must consider
the relation of the parties as shown by extrinsic evidence.
We shall first review the evidence as to the construction of
the projected railroad line, prefaced, as it must be, with a
short history of its origin and development. Next shall
be given the evidence as to the practical relations existing
between the Union Pacific Railway Company and the
Kearney & Black Hills Company, as indicated by the con-
struction given the contract between the parties.

J. H. Hamilton, who at the time the bonds were voted
was vice president of the Kearney & Black Hills Railroad
Company, testified that at the time of giving his evidence
the constructed railroad of the Kearney & Black Hills
Company was sixty-five and seventy-three one-hundredths
miles in length; that when the company was organized the
stock subscriptions were for $500,000, but that the stock
was not issued until the money was paid in and the road
built. Altogether there was paid in $320,000, being eighty
per cent on $400,000. The railroad company let the con-
tract for building their road to the Wood River Improve-
ment Company, and the Wood River Improvement Com-
pany built the railroad for so much stock and so much
bonds. The bonds have been declared in the dividend, and
at the time of the trial were held by the individual stock-
holders of the Wood River Improvement Company. No
stock was subscribed by the Wood River Improvement
Company. This company got stock for building the rail-
road. The stock is not issued yet; it will be issued when

there is a settlement between the Wood River Improvement Company and the railroad company. The Wood River Improvement Company distributed the stock it received for building the railroad to the stockholders in the Wood River Improvement Company. The railroad stock was all issued to the Wood River Improvement Company. The Kearney & Black Hills Railroad Company transferred all its stock to the Wood River Improvement Company (except enough to enable them to hold office in the company) upon the improvement company assuming the obligations of the subscribers for stock in the Kearney & Black Hills Railroad Company. The Wood River Improvement Company, for and in consideration of the transfer to them of this $500,000 of stock, undertook and did build this road and equipped it. The Wood River Improvement Company got 5020.1691 shares of stock—all the stock that was ever issued by the railroad company except 1429.6691 shares, which were issued to the Union Pacific Railroad Company. Beside the above stock the Wood River Improvement Company received for building the road $13,500 per mile of the bonds of the railroad company. The aggregate cost of building and equipping the road was $800,000. As before stated, eighty per cent of $400,000, or $320,000, was raised by assessments upon the holders of the stock of the Wood River Improvement Company. The residue of the $800,000 they borrowed upon the security of the bonds of the Kearney & Black Hills Railroad Company. They owed the most of it at the time the witness Hamilton testified.

The Union Pacific Railroad Company held by itself and its officers, of the Wood River Improvement Company's total stock of $400,000, stock to the amount of $210,000. At the time of the trial there was held by parties resident in Kearney, Mr. Tillson, Mr. Downing, and others, $145,000 par value of stock in the Wood River Improvement Company. The bonds issued by the Kearney &

Black Hills Railroad Company were to the amount of $13,500 per mile. Mr. Hamilton testified that before the bonds were voted on, he and his associates had drafted an agreement by which they had an option to build a line either from Pleasanton on the South Loup line, or from Kearney, and were to pay the Union Pacific Company $205,000 in first mortgage bonds of the Kearney & Black Hills Railroad Company for the grade. About two weeks after the election, Mr. Hamilton testified that he went to Boston to sign up the agreement; that all the previous sketches and drafts that had been made were already there. The agreement was made up finally from the sketches and drafts that had been made in part. The Omaha & Republican Valley Railroad Company owned the grade and right of way which the Kearney & Black Hills Railroad Company was compelled to purchase for the construction of its line. The Union Pacific Company owns the stock of the Omaha & Republican Valley Railroad Company; the Union Pacific Company made the trade; the Union Pacific Company made the deal; it controlled the Omaha & Republican Valley Company, and whatever the Union Pacific Company agreed to the Omaha & Republican Valley Company had to.

Mr. Hamilton further testified that Mr. Davidson was not acquainted with the details of the agreement made with the Union Pacific Railway Company; that he guessed he himself was the only one who was, as he transacted all the business. Mr. Davidson knew that the Kearney & Black Hills Railroad Company was to run in connection with the Union Pacific so far as freight traffic was concerned. Mr. Hamilton testified that after the election was held and the result announced, before thirty days had expired, the railroad company commenced the work of construction and completed the road October 7, 1890, to Callaway.

As to the present condition of the traffic affairs of the Kearney & Black Hills Railroad Company, its general

freight and passenger agent testified that the B. & M. R. R., through the C., B. & Q. R. R. Co., has a direct line from Kearney to Chicago; that when the Kearney & Black Hills railroad had a consignment from Callaway to Chicago over the C., B. & Q. railroad the same rate is not charged the shipper as when the consignment is by way of the Union Pacific railway, because the Kearney & Black Hills Railroad Company has no through rate from Kearney to Chicago with the C., B. & Q. R. R. Co; that there exists a through rate with the Union Pacific Railroad Company. There is a difference in favor of the Union Pacific road. The B. & M. road does not run across the tracks of the Union Pacific railroad to the tracks of the Kearney & Black Hills road and that would make it more expensive. It is more expensive to ship from a point on the Kearney & Black Hills railroad to Chicago over the B. & M. than over the Union Pacific railroad because of added local charges, and on account of transfer charges across the Union Pacific railway's track at Kearney; would have to get consent of the Union Pacific Railway Company to do this. The Kearney & Black Hills Railroad Company is in competition with the B. & M. on the Grand Island Branch. The Kearney & Black Hills road does not own the line across to the Grand Island line; it is a wagon competition. Between the Grand Island branch of the B. & M. R. R. and the Kearney & Black Hills railroad line there is a strip of from twenty to thirty miles.

It is unnecessary to review the evidence which has already been stated at considerable length in stating our conclusions as to the relations which the Kearney & Black Hills Railway Company sustain to the Union Pacific Railway Company. The last named company owns, by reason of the sale of the road bed, 1,429 shares, and through the Wood River Improvement Company, controls the remainder of the capital stock of the Kearney & Black Hills

Railroad Company, and is entitled to one-half of whatever increase of stock shall hereafter be made. To secure this and other interests of the Union Pacific Railway Company, it practically has the right to name the secretary and two directors of the Kearney & Black Hills Railroad Company. By means of the Wood River Improvement Company, the Union Pacific Railway was able to secure the control and placing of the bonds, secured by first mortgage, of the Kearney & Black Hills Railroad Company to the amount of $13,500 per mile, all the bonds issued. By reason of the necessity of crossing the Union Pacific line at Kearney to reach any other railroad connection, the Kearney & Black Hills Railroad Company is powerless to establish or maintain traffic relations with any line of railroad other than the Union Pacific, even if it was willing to violate the restrictive terms of its agreement to the contrary. It is idle to insist that under such conditions the Kearney & Black Hills railroad is, or ever can be, independent of the Union Pacific Railway Company in any sense whatever.

It is established satisfactorily that one main inducement to the voting of the bonds was the representation that the proposed railroad should, when built, be independent of the Union Pacific Railway Company. With equal conclusiveness the evidence shows that this representation has failed; that though in a certain sense something of independence existed at the time of making these representations, yet that immediately, or very soon after the bonds were voted, such independence, by the voluntary act of the donee of the bonds, wholly ceased to exist. In the face of this condition of affairs the donee of the bonds insists that the injunction prohibiting the delivery of the bonds shall be dissolved, and that this court shall sanction such delivery.

In *Wullenwaber v. Dunigan*, 30 Neb., 877, it was held, where certain petitioners were induced to sign a petition calling an election in K. township, Seward county, upon

the representations of an agent of the railway company that the depot would be located on section 16 of said township, when in fact the depot was afterwards located on section 17, that the company was bound by the representations of its agents, and that persons who had been deceived thereby and induced to sign the petition might set up such facts to enjoin the issuing of bonds. In the opinion rendered by MAXWELL, J., occurs the following apposite language: "A proposition to vote bonds is in the nature of a contract which, when accepted, is binding upon the respective parties. Hence, if the electors, through false or fraudulent representations, have been induced to vote bonds to aid in the construction of such railway, a court of equity in a proper case will grant relief. (*Curry v. Board of Supervisors*, 15 N. W. Rep. [Ia.], 602; *Sinnett v. Moles*, 38 Ia., 25; *Henderson v. San Antonio R. Co.*, 67 Am. Dec., 675; *Crump v. U. S. Mining Co.*, 56 Id., 116; *Wickham v. Grant*, 28 Kan., 517.)"

In the case under consideration the representation was of the existence of a fact of controlling weight with the electors called upon to vote bonds in aid of the enterprise projected. The voter could only know of the nature and object of the project to be assisted by the representations of its promoters. These representations necessarily referred to future conditions, the power to establish which was lodged in the promoters of the scheme. The promise was that the road, when built, should exist and operate in entire independence of the domination of another road already in existence. It might be that this independence was undesirable, useless, and worthless. That proposition however, should have been argued to the voters. It cannot now be urged against them. In an opinion of this court, in *Township of Midland v. County Board of Gage County*, 37 Neb., 582, filed during the present term, it has been held that the electors of a township are entitled to stand upon the very letter of their promise, a wholesome rule which should be

extended to the facts under consideration. In the case at bar it may be that the insistence upon independence of the Union Pacific railway was without reason, and even merely whimsical, yet it was a condition which the voters had a right to insist upon as qualifying their proposed donations. The propriety of employing the power of taxation to making donations to enterprises in no way connected with the administration of government may well be doubted in any case. Such restrictive conditions as the voters see fit to insist upon must not be ignored by the proposed donee, especially after accepting the donation burdened with them.

The judgment of the district court is reversed, and a decree will be entered in this court conformably to the prayer of appellant's petition.

DECREE ACCORDINGLY.

THE other commissioners concur.