ROBERT L. LEWIS ET AL., APPELLANTS, V. O. H. EYERLY ET AL., COUNTY COMMISSIONERS, APPELLEES.

FILED OCTOBER 17, 1930. No. 27236.

*Halligan, Beatty & Halligan* and *Milton C. Murphy,* for .appellants.

*Beeler, Crosby & Baskins* and *C. S. Beck, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY and DAY, JJ., and JAMES and WRIGHT, District Judges.

JAMES, District Judge.

This is a suit in equity brought by the plaintiffs as resident electors and taxpayers within the territory which the defendants, as county commissioners of Lincoln county, attempted to create into a voting precinct under the name of "Maxwell precinct." The defendants are the commissioners of said county. The object of the suit is to enjoin the issuance and delivery of certain precinct bonds voted by the said Maxwell precinct in said county, said bonds to be used for the purpose of constructing a series of wagon bridges over and across the channels of the Platte river. Then follows a description of the location of the proposed bridges.

The history of this case in general is as follows: On July 26, 1926, the board of county commissioners, at a regular adjourned session, by an order, formed out of certain territory what has been referred to as the new "Maxwell precinct." On August 6, 1926, there was filed in the office of the county clerk of Lincoln county, Nebraska, a petition praying for a special election to be held in Maxwell precinct of said county, submitting to the electors the question of issuing bonds in the sum of $35,000, to be used in constructing a series of wagon bridges across certain channels of the Platte river, and also giving the location of the bridges. This matter was taken up at a regular session of the board of commissioners on August 16, 1926, and a special election was ordered held on October 12, 1926, in said precinct. Notice of this election was given as required by statute, and the law seems to have been fully complied with. The election was held and resulted in favor of the bonds. The bonds were then issued and registered in both county and state, as required by law. No further action was taken, so far as the records show, toward construction of the bridges. On November 10, 1928, another petition was filed with the commissioners, praying that a special election be called to submit to the electors of said precinct the question of canceling the $35,000 bond issue and voting on the question of issuing $40,000 bonds, including changing the location of the

bridges, all providing, however, that the government and the state would render certain assistance in the construction of the bridges. On the 19th day of November, at a regular session, the board issued an order calling a special election for December 27, 1928, which election was held, and resulted in favor of the bonds.

The petition of the plaintiffs is quite voluminous, but upon a careful analysis the court has come to the conclusion that the material charges contained therein are as follows:

(1) That the formation of Maxwell precinct was procured by fraud; (2) that the signatures to the petition, asking the board of commissioners to call an election, was procured by fraud and misrepresentations; (3) that the proposition of voting bonds was not legally submitted by the official ballot; and (4) that a precinct cannot legally vote bonds to construct a bridge at a point where no highway has been established.

If any one of the above propositions contended for by appellants should be decided in their favor, then the case should be reversed. In order that the case may be affirmed, all of said propositions must be decided in favor of the appellees.

1. Was the formation of Maxwell precinct procured by fraud? Under this proposition, the board of commissioners attempted to act under section 885, Comp. St. 1922, which gives to a board the power to create and change voting precincts. This statute, as it stood at the time of the transaction in question, is as follows:

"Each board of county commissioners shall divide the county into convenient precincts and, as occasion may require, erect new ones, subdivide precincts already established and alter precinct lines. And whenever any portion of territory containing in the aggregate not less than one township of land, and not more than four townships lying contiguous, shall contain not less than fifteen voters, it shall be the duty of the county commissioners, on receipt of a petition signed by a majority of the legal voters therein, to constitute such portion of the territory a voting

precinct: Provided, that all of the territory within the corporate limits of a city of the second class or village shall be included within some voting precinct having a polling place within such city or village."

The new Maxwell precinct embraces within its boundaries several precincts and parts of others, its length extending thirty miles north and south and from six to ten miles east and west.

The county commissioners on July 26, 1926, at a regular adjourned session of the board, enacted an order forming and creating the new Maxwell precinct, a copy of which is as follows:

"Commencing at the southeast corner of section 36, township 9 on range line between ranges 27 and 28; thence north on range line to the northeast corner of section 1, township 13, between ranges 27 and 28; thence west to the northwest corner of section 6, township 13, range 28; thence south to the Platte river bank between sections 19 and 24, township 13, between ranges 28 and 29; thence northwesterly along bank of river to the west line of section 8, township 13, range 29; thence south on section line to the south bank of the Platte river; thence southeasterly along the south bank of the river to the northeast corner of section 21, township 13, range 29; thence south on section line 18 miles to the southwest corner of section 16, township 10, range 29; thence east 4 miles to the southeast corner of section 13, township 10, range 29; thence south 9 miles to the southwest corner of section 31, township 9, range 28; thence east 6 miles on county line to point of beginning; into a precinct to be known as Maxwell precinct."

Our courts have held that precincts are "mere territorial divisions or districts created for certain political and administrative purposes, and without the semblance of corporate character." *State v. Dodge County*, 10 Neb. 20.

The petition charges that the formation of this precinct was procured by fraud. The only evidence in support of this allegation is the record of the board's act. Under said section 885, Comp. St. 1922, the commissioners have the

power and it is their duty to form or change precincts in order that the inhabitants thereof may carry on the business of their precinct reasonably and fairly to all. There is no evidence of any fraud having entered into the proceedings had by the commissioners in their attempt to create Maxwell precinct. It was done at a regularly adjourned meeting, with all members of the board present. It is true that the territory included in this new Maxwell precinct is exceptionally large. But would that alone constitute fraud to the extent of rendering their acts illegal? It is also true that the charge is made that the precinct was formed for one purpose only—voting bonds for the erection of bridges over the Platte river. Such may be the fact, but there is no evidence in the record sufficient to warrant the court in making such finding. After a study of this charge, and the evidence in support of it, and applying thereto the provisions of section 885, Comp. St. 1922, the court is forced to the conclusion that the record does not disclose any act that would establish fraud or any irregularity in the creating of the precinct which would warrant the court in holding that it had been fraudulently created; and, so far as the formation of Maxwell precinct is involved herein, the court holds that the same was legally formed.

2. Was the petition presented to the county board of commissioners procured by false representations? The evidence in support of this proposition was of three voters, who were solicited to sign the petition, and it consists of conversations between Lewis E. Story, the solicitor for signatures to the petition, and F. C. Christensen, E. C. Hostetter, and J. L. Burke. These last three named gentlemen were called as witnesses on behalf of the plaintiffs, and their testimony in connection with the allegation that their representations influenced the voters in signing the petition is as follows:

F. C. Christensen: "Q. What, if any, statements did he make to you with reference to what would be done if the bridge bonds were voted there for the building of this bridge, in the manner of the government paving the high-

way out to Fort McPherson there? A. Why, he made a statement that the government would pave the road from Fort McPherson to Maxwell. Q.. Now, was that statement made to you before—just withdraw that—did you sign the petition for the calling of the election to vote on the $40,000 bonds? A. Yes. Q. Was this statement made to you prior to the time that you signed the petition? A. Yes; that was the inducement to have me sign the petition. Q. And did you sign the petition believing that? A. Yes; I did. Q. And had you known that the federal government was not going to pave from Maxwell to Fort McPherson would you have signed the petition? A. No; I would not."

E. C. Hostetter.: "Q. Did you ever have any talk with Mr. Story about—prior to the holding of this last election? A. Yes, sir. Q. As to what the federal government would do if this new bridge was located on the new route? A. Yes, sir. Q. When did you have that talk with him? A. Oh, quite a while before the—I don't know the date, but quite a while before election. Q. And just what did he say to you there, Mr. Hostetter, about that matter? A. Well, the first he came to me and he asked me how I thought about changing the bridge down there if the government would pave it three miles to the cemetery and get a highway through there, and I told him I didn't know. but what I would be in favor of that. Q. And what, if any, other statement was made with reference to a highway being established from Fort McPherson south to the county line through the new precinct? A. Well, I don't know as Story made that one. They said it would be a federal aid on the state highway, the state maintain it on the south highway, that is, Story, but there is a lot of them down the line said they was getting a state highway through there. Q. Was it generally talked around Maxwell there and in this new precinct that the federal government was going to pave this three miles if the bridge was built? A. Yes, sir."

Cross-examination: "Q. Mr. Hostetter, that was a considerable length of time before election was had? A. Not so very far before; yes. Q. And it was pretty generally talked that the paving wasn't going through just before

election was held? A. Yes. Q. And that was generally known? A. Yes. Q. You knew of it? A. Sure."

J. L. Burke: "Q. Have you ever talked to Mr. Story, Mr. Burke, about what the federal government would do prior to the election if this $40,000 was voted to build a bridge there? A. Yes, sir; I did. Q. And what talk did you have with him? A. Well, the government was to build and the state was to build and pave a bridge across from Maxwell. Q. You said 'pave a bridge,' you mean— A. Pave the road and build a bridge across from Maxwell to Fort McPherson cemetery, and the bridge, so he said, would be a little farther on for you but you would have a good road; that was his cry and talk at the time. Q. Do you know whether or not that was generally talked there before the election? A. Yes, sir; it was. Q. That the government would build and pave the highway? A. Yes, sir."

Cross-examination: "Q. But you knew that this paved road wasn't going to be put through before election? A. That was my first understanding about the paved road, was all. Q. Well, what I am asking you, you knew before the election was actually had that it was not going to be paved, didn't you? A. Yes; I guess that is right. Q. And you heard other people discuss it too, didn't you? A. Yes; I heard them."

This was all the evidence as to fraud, as disclosed by the record.

To this evidence Mr. Story, the solicitor, testified as follows: "Q. When was the last time that you know of, Mr. Story, that the question of paving from Maxwell to Fort McPherson was talked? A. Well, I couldn't give the date exactly, but the engineers, the federal engineers, were surveying down there; they were running over the old route and then the route east, to make a report on the locations, and these reports started while they was making their surveys, making investigations. Q. When was that, about what month, can you tell us? A. Well, I imagine it would be in August; might have been the latter part of July, but I think it was in August. Q. And when was it that you

learned that the federal government would not pave from Maxwell to Fort McPherson? A. That was September 26. I asked Mr. Shoemaker plainly. We had a delegation from Maxwell and from the island, south side, come up here and meet with the federal engineer and the state engineer, Roy Cochran, and talk over the proposition, and I asked Mr. Shoemaker plainly if we accepted this new proposition will the government pave it, and he said: 'No; they won't consider that route at all.' And I considered that was definite enough. Q. And after that time did you ever tell anybody that the government would pave from Maxwell to Fort McPherson? A. I did not."

The county commissioners, before calling an election for any precinct to vote bonds for any purpose authorized by statute, must have presented to them a petition signed by not less than 50 freeholders of the precinct, praying for the calling of a special election. The county commissioners obtain their authority for calling special elections upon the filing of such petition under the first subdivision of section 330, Comp. St. 1922, which provides there shall be "a petition signed by not less than fifty freeholders of the precinct," praying for the calling of a special election. "Upon the reception of such petition the county board shall give notice and call an election in the precinct."

On November 10, 1928, there was filed in the office of the county clerk of Lincoln county, Nebraska, a petition praying for the calling of a special election to be held in Maxwell precinct, for the submission to the electors of a cancelation of the $35,000 bond issue voted at a former election, and the further question of voting a $40,000 bond issue for the same purpose, i. e., erecting bridges. The petition sets out fully the questions to be submitted, and is signed by 72 freeholders. Were they procured by fraud? The record shows that only three witnesses testified as to these representations, and of these three only one signed the petition.

Have the plaintiffs established the allegation of fraud in procuring signatures to the petition which was presented to the board of commissioners by a preponderance of the

evidence? Even if the signature of Christensen was procured by fraud, would that warrant the court in finding in favor of the plaintiffs and enjoining the issuance of the bonds? As stated, 72 freeholders signed the petition, and, so far as the record shows, Christensen was the only one to whom any false representations were made. The other 71 make no complaint.

"In the absence of evidence to the contrary, honest and fair dealing in all transactions are always to be presumed; and, if any person claims there was fraud in any transaction, it devolves upon such person to prove the fraud, and it does not devolve upon the party charged with committing the fraud to prove that the transactions were honest and bona fide." *Long Bros. v. West & Co.,* 31 Kan. 298.

It is the opinion of the court that, where a party alleges fraud in procuring signatures to a petition to be presented to a county board, praying that said board call a special election in the precinct to vote on a proposition to bond the precinct to raise funds to construct a public bridge over a river running through said precinct, said party must not only prove by a preponderance of the evidence that said signatures were procured by fraud, but must further prove by a preponderance of the evidence that said signatures procured by fraud were the moving cause of the action of the board in calling said special election. The court finds upon a careful consideration of the evidence offered by plaintiffs on the allegation of fraud, as set out in their petition, in procuring signatures of the freeholders, that plaintiffs have failed to established such fraud by a preponderance of the evidence.

3. Was the question of voting bonds void, as submitted, on account of the form of the official ballot? The question to be submitted by the board, for the election to be held on December 27, 1928, contained two primary propositions: First. "Shall the board of county commissioners of the county of Lincoln, state of Nebraska (provided and conditioned on the cancelation and annulment of the thirty-five thousand and no/100 ($35,000) dollars of Maxwell precinct bridge bonds heretofore voted, executed and regis-

tered) issue forty thousand and no/100 ($40,000) dollars of Maxwell precinct bridge bonds?" In this call there was included the question of the cancelation of the $35,000 bonds, and also the provision that, if the issue of $35,000 bonds were not canceled, then the $40,000 bonds should not be carried. The official ballot submitted the two propositions—one for and one against each one. The first part of the official ballot used at the election provided for those wishing to vote in favor of issuing said bonds as follows: "☐ For issuing forty thousand and no/100 ($40,000) dollars of Maxwell precinct bridge bonds (provided and conditioned on the cancelation and annulment of the thirty-five thousand and no/100 ($35,000) dollars of Maxwell precinct bridge bonds heretofore voted, executed and registered.)" That part of the official ballot for voting against the issuance of said bonds was the same as the part which provided for voting in favor of said bonds, except it contained "☐ Against." On the same ballot there appeared the other proposition, both the affirmative and negative vote. The affirmative was: "☐ For canceling and annulling and to cause to be canceled and annulled and not issue the thirty-five thousand and no/100 ($35,000) dollars of Maxwell precinct bridge bonds voted on October 12, 1926, and dated January 1, 1927." On the same ballot the negative was exactly in the same form as the affirmative except "☐ Against."

The contention of the plaintiffs is that these ballots were not definite and certain, and that to some extent they contained alternative propositions to be voted upon so that the voter is required to vote in the affirmative or negative upon more than one proposition in casting a single ballot. There has been nothing presented to the court on this proposition as to the illegality of submitting this proposition in the form in which it was presented; that is, there is nothing in the law that would forbid submitting a question as this was submitted, if the propositions are plain to the elector. It is true, the general rule of law is that a proposition submitted to an elector must be submitted in such manner that the elector knows definitely and certainly just how to

vote for or against the proposition submitted. From an examination of this ballot, it appears that it expresses: First. Shall or shall not the $40,000 bonds be issued? Second. Shall or shall not the $35,000 bonds be canceled? It appears to the court that the notice of the election and the form of the official ballot gave the elector a clear understanding as to voting in the affirmative or negative upon the two propositions—one for or against the $40,000 bond issue, and the other for or against the cancelation of the $35,000 issue. There is no evidence in the record showing that any elector was misled in any way by the form of the official ballot, or by the propositions submitted. It is the conclusion of the court that the proposition submitted to the electors at the election held on December 27, 1928, was fair, definite and certain, and did not contain alternative propositions which would mislead or embarrass the elector as to what proposition he was voting for or against, to the extent that the election should be held void.

4. The proposition, or objections raised by the appellants, as to the legality of the bonds to be issued, is in substance that no right of way for the road leading to such bridge has been procured, or for the bridge. In determining this issue, it is necessary to examine the petition filed and presented to the board, praying for the calling of a special election to vote bonds for the erection of bridges over certain channels of the Platte river; also to examine the order made by the board calling a special election, submitting to the electors an opportunity to vote upon the bond proposition. The petition filed and presented to the board, signed by 72 freeholders of Maxwell precinct, contains the following:

"And said bonds to be approximately one-half of the entire cost of the construction of said bridges, as hereinbefore set forth, and the other one-half of the cost of construction of said bridges is to be borne by the United States government under the provisions of the federal aid law, according to the provisions of title 23 of the Code of Laws of the United States, chapter 1, known as the 'Federal Highway Act;' and, moreover, the state of Nebraska is to

construct a highway approximately on said section line, and to connect with said bridges on the north and south side of said streams, and permanently keep the same in repair; but should such federal aid not be granted, and the construction of said road by the state of Nebraska not be done and performed, then these bonds of said Maxwell precinct herein petitioned for to be ordered voted upon shall not be issued."

The notice or call of the special election to be held in Maxwell precinct, calling for the election to be held on the 27th day of December, 1928, contained the identical language as set forth in the petition upon which said call was based. It will be noticed both contain the provision that "the state of Nebraska is to construct a highway approximately on said section line." It is true, there is no highway there at the present time, but the bonds are conditional that there shall be one constructed by the state before the bonds can be issued; and, should said federal aid not be granted, then the bonds could not be issued. Before the bonds can become effective, two acts must be performed— one by the national government and one by the state. These bonds are not absolute bonds at the present time; they are simply conditional bonds, depending upon a future contingency as to whether or not they may ever be issued.

Appellants have cited and relied upon the case of *Brooks v. MacLean*, 95 Neb. 16, where the bonds under somewhat similar circumstances were held illegal; but that case was reversed because of a failure to set out definitely just how and where the money was to be expended, and that the electors were entitled to such specific information before being called upon to vote. Because such information was not furnished, the entire proposition was indefinite and uncertain. Hence, the facts in the *Brooks* case are materially different from those in the case at bar. In the case at bar, the information necessary to inform the voters how and where the money is to be expended is definitely set out. The elector is also informed where the state was to build its highway and where the bridge was to be constructed; also informed of the conditions under which said bonds can

be issued. There is nothing indefinite or uncertain about these items in the record.

It has been held by our court that a proposition to vote bonds is in the nature of a contract. *Wullenwaber v. Dunigan,* 30 Neb. 877; *Nash v. Baker,* 37 Neb. 713. Maxwell precinct, under the power given it by statute and the authority of the county board of commissioners, in order to carry out its part of such a proposition, voted these bonds. As the record stands at the present time, these bonds have no vitality; they are in embryo; they could not be enforced; they could not legally be recorded; the county could not legally sell or dispose of the bonds; the county commissioners have no authority to make any levy upon the property of said Maxwell precinct to pay the bonds or interest; they have been voted and are now held in abeyance until the conditions therein named are performed by the government and the state which would give them vitality. If these conditions are never performed, then said bonds will never be issued. The court feels that, under the record in this case, the objections raised by appellants are without merit.

The findings of the court herein renders it unnecessary to determine other charges set out in appellants' brief.

It is, therefore, the opinion and judgment of the court that the judgment of the district court is right, and that the same should be and is hereby

AFFIRMED.

ROSE AND GOOD, JJ., CONCUR IN RESULT.